We're talking about we didn't take a break. I know, so let's have it. Yeah. But we'll of course give them the time that they have. No, we have the time that they have. We would not do that. Okay. They asked for it. Okay. Good afternoon. Go ahead. May it please the court. Nithin Sood on behalf of the plaintiff appellant Nikesh Shah. This is an ERISA interference case and the two issues before the court are whether there was a prima facie case of interference with ERISA benefits and whether there's pretext. Summary judgment was granted at the trial court level. The element under the prima facie case was is there evidence that Mr. Shah was discharged under circumstances that give rise to an inference of discrimination. There's no requirement to prove discriminatory intent and we need to show evidence that there was an inference that evidence was a motivating factor. A significant issue in this case was the timing of when Mr. Shah was terminated. He was terminated only two days before he would have been eligible for a severance program. Originally he was put on a PIP and the PIP was going to end on February 15th, 2017. He was informed it was going to be February 15th. The PIP said February 15th. Internally the company made a decision to eliminate his position months in advance. Eventually decided to terminate him and Chevron has tried to distinguish between eliminating a position and terminating him. With respect to the summary judgment motion, our position is it's the same issue. He was never told that his position was going to be eliminated. Ultimately Chevron decided to terminate him two days before he would have been eligible for the Project Delta severance program on February 13th. The amount of savings would have been, and this was an issue from the district court where the district court did not address the amount of savings that Chevron saved. He would have been eligible for about $28,000 under the severance program and about $78,000 once he hit the five-year vesting benefit which would have occurred two months later. There was also discussions about his position being eliminated. There were discussions in early September of 2016 that other people would take over his job. He was never told that. Internally Chevron decided to eliminate his position in December of 2016. This is significant because he was placed on this performance improvement plan, which our position was it's basically pretext. But in the grand scheme of things, how can an employee fulfill a PIP related to the job when the decision has been made to eliminate the position? I believe that raises a fact issue on that matter. One issue that Chevron has raised was that the decision maker was supposedly not aware of the five-year vesting benefit. Therefore, she submitted a declaration conclusively saying that Project Delta had no influence on her and she wasn't aware of the five-year vesting benefit. I think that kind of relates to this honest belief doctrine where that's a fact issue. We have a manager who's been employed with Chevron for 15 years, supervises, mentors, guides, provides career development to employees. For her to say I didn't know about the five-year vesting program, that raises a fact issue. I think it's inappropriate to any extent that the district court relied on that to grant summary judgment to make that decision at summary judgment. With respect to pretext, there are several different examples of pretext from an evidentiary standpoint, which I believe the district court summarized and then glossed over and dismissed it as minor inconsistencies, which is not appropriate at the summary judgment level. A significant issue is the decision maker placed a comparator, Mr. Shaw's predecessor, gave him a lower review but did not place him on a PIP, did not recommend terminating him, and instead helped him find another job within Chevron. That did not happen to Mr. Shaw, who had a higher rating by the same decision maker in the exact same job. Also, the timing of when Ms. Harrison, the decision maker, started aggressively accusing him of poor performance. It was right after Project Delta was announced. The person who had the higher rating, is this the Colon person? Mr. Colon had the lower rating prior to it. He had a 3, and Mr. Shaw had a higher rating. Were they actually similarly situated? They had the exact same. They had higher, different salary grades. They were considered differently and thought that one needed to perform better because they were higher up. Well, I think that would be a fact issue because under the standard here, the issues are what's the job, what's the supervisor, and they had the exact same job. They overlapped while Mr. Colon got Mr. Shaw up to speed. Mr. Colon moved on. They had the exact same job duties. There's evidence in the record from Mr. Yates, one of the decision makers, him talking about what their job duties were, from Mr. Colon talking about what his job duties were, and Mr. Shaw in his declaration, and they all talked about the same job duties. The mere fact that Chevron assigns a number which says pay scale grade isn't an element for determining whether they're similarly situated or not, at least that's summary judgment. We don't know what that means. It's a number. Mr. Shaw was number 23, and Mr. Colon was the number 20, and that's all I know, and that's all the evidence is, and that doesn't make them not similarly situated. Other elements of pretext was there's an incorrect date in the PIP that was given to Mr. Shaw that Ms. Harrison was aware of, and most significantly with respect to the substance of the PIP. He was told it would end on February 15th. For whatever reason, which Chevron, when I asked them in their deposition, the witnesses, they cannot explain why the dates were reverted back. They reverted back to earlier dates, and no explanation could be given. There's also documentation about emails from Ms. Harrison to Mr. Yates to higher up, after they'd already decided to terminate Mr. Shaw, basically creating a documentation, what I'd call an exculpatory paper trail, to try to justify the reasons for terminating him after the fact, and under burden versus free scale, that's evidence of pretext. There's also been other objective evidence of Mr. Shaw's satisfactory job performance. One issue that the district court brought up is it seems to focus on this language of specific intent, and just looking back at it, no courts have really explained what a specific intent means. I don't think in this type of case it's any different than the word intent in a discrimination case. It appears that specific intent probably means you can't have a disparate impact type claim in an ERISA claim, which may make sense. But the problem with the district court's decision is that it appears to create a pretext plus argument, saying that yes, Chevron may have all these false statements or inconsistent shifting statements, but it's irrelevant, because there's no other evidence of discriminatory intent. And I think that's improper in this type of case, because under St. Mary's v. Hicks and Reeves and those progeny, you can infer unlawful discrimination based just on pretext, and that's up for the fact finder to decide at trial. So specific intent shouldn't create some sort of heightened element here. So assuming that we agree with you, but why isn't there still pretext? Because he had poor performance. And he was getting poor performance from a whole variety of people that were all contributing to his evaluations of being a poor performer in his group. So the performance issues seem to come from his decision maker after Project Delta was announced. And there was discussion about cutting costs, and I understand costs alone is not the issue. But when you look at his PMP, the draft PMP on August 4th, the day after Project Delta is announced, she criticizes his performance. There's more documentation attacking him. And I think that's different than a few random emails where she might be providing constructive feedback, which I believe Chevron even acknowledges. Constructive feedback, coaching, that's different than putting him on a pit a couple months later. And I believe it's only one person. I'm still not seeing that he's got, he has problems. I mean, he's not arguing that he didn't have those problems, as far as I can see. Well, with respect to the PIP, there are three elements we brought up. There were three things brought up. One was a timing on an issue, saying he didn't meet a deadline. And the evidence, which is in the record, shows that he did meet the deadline. And his supervisor, Ms. Harrison, was told by Mr. Yates that actually the deadline was October 7th. It wasn't September 30th, so he met the deadline. Even after that, she dings him for that in the PIP. That's evidence of her having knowledge of incorrect information, yet consciously putting it in the PIP. And also, with respect to, if you think about this, they've decided to eliminate the position. And so now they're putting something in the PIP. If you look at it substantively, basically indicating add value to this position, but they've already decided to eliminate it. So this is a situation where the job and the functions of it are arguably pointless, and they're telling him, they should just tell him, hey, we're going to eliminate the position because we don't need it. You know, go find something else. But instead they put him on a PIP. He says you have to do that? I mean, how is that automatically discrimination? The access was for your client's benefit, that if he could really show great improvement, then they would try to find a place for him in the organization later. I mean, so it doesn't have to be nefarious. That alone is not... But the issue is why not tell him that, hey, we're going to eliminate this position. They decided that other people are going to take it over in September. And there's documentation that they decide to eliminate it for sure in December. Why not tell him? Well, the issue is it was a set-up. There's no way he could perform well if they already decided to get rid of the PIP. I mean, get rid of the position. Well, they have it, and if he performs super well, then they might keep him. Or maybe they wouldn't, but we don't know that. I understand, and with respect to the performance aspect, there is evidence from his declaration and his deposition that he was meeting the expectations. The only evidence otherwise is coming afterwards is coming from the decision-maker, Ms. Harrison, who it appears her intent was created after Project Delta was announced, which shows the discriminatory intent arising after that. But there's evidence in the record that Harrison had already discussed job performance issues with Shaw before Project Delta was. You said several times that it's after Delta. But Harrison had already been discussing it. I think there's a difference between coaching an employee like every manager should do, providing constructive feedback, versus disciplining them to the extent that they're creating documentation to put them on a PIP. And so that's the distinction here. Just because earlier in the year, you have a handful of emails where you said, hey, you should have done this. We don't have the thousands of emails that got exchanged back and forth between them. And so that's the difference here. But even then, at the end of the day, they told him your end date for the PIP would be February 15th. And even in the emails, they're talking about February 15th. For whatever reason, they change it back to February 13th, just a day before they announce who's in the scope and just two days before, if you're employed, you can become eligible for Project Delta. Why change it? Why drop it back two days? Even if, and again, this could be a motivating factor. All I need to do is show a motivating factor here. Even if it's his performance that's part of it, the issue is why is the decision being made at that time? Even if it's budget cutting, that's not nefarious on its own. Not on its own. You have to have some evidence that it's associated with the ERISA benefits. And I think the evidence is the timing here. Because if he hit that two days, got February 15th, the other evidence in the record is that, from the HR manager, is that once you come under the scope of Project Delta, you can remain employed for two months afterwards. So had he hit that, he could remain employed for two months. There's no evidence, there's not any emails or anything that would say that the person making the decision knew the relationship between ERISA benefits and this, they definitely knew their budget was having to be cut and it was trim and it's an austere time. But there's no evidence that they knew anything to do with benefits. As far as I know, perhaps you could have, can you help me? Am I missing something? The thing is, again, I'm not trying, I can't bring, this is not a direct evidence case, so I wouldn't turn this into a direct evidence case. I'm looking at the circumstantial evidence based on the timing and the dollars saved and what actually happened. Why revert back those two days? Why create issues? Why not tell him? Hey, your position may be eliminated. In fact, it is eliminated. You might tell people and then it would denounce the thing that they don't want to know, that they don't want people panicking about until it actually comes to fruition at the time management has deemed is the right time. And that may be the case, but that's still a fact issue to decide. It's not a summary judgment issue. Okay, thank you. I think we have your argument and you've saved time for rebuttal. May it please the court. To recover under Section 510 of ERISA, Shaw must demonstrate that he was, that his employment was terminated with specific intent to interfere with his benefits. Shaw's challenge to the summary judgment hinges largely on the temporal proximity between his termination and the vesting date of his retirement benefits and the effective date of the Project Delta severance plan. However, mere incidental timing in the absence of any evidence of improper motivation is insufficient to satisfy Shaw's summary judgment burden. Shaw recognizes that he has no direct evidence that Chevron intended to interfere. He admits that he relies purely on circumstantial evidence alone. Therefore, the District Court applied the three-tiered McDonnell-Douglas burden-shifting scheme for circumstantial evidence. The judgment must be affirmed because, number one, Shaw failed to state a prima facie showing of a specific intent to interfere with his ERISA benefits. Second, even if he did make a prima facie case, Chevron demonstrated that it had a legitimate non-discriminatory reason for terminating him. And third, Shaw failed to raise a fact issue as to whether his stated reasons were a pretext for discrimination. Mr. Shaw repeatedly, the lawyer for Mr. Shaw repeatedly said, why didn't they just fire him? Earlier, they decided to eliminate the position. And doesn't the fact that they didn't do that create evidence of suspicious evidence that could be evidence of pretext? Your Honor, I disagree. As the record bears, Mr. Shaw had had ongoing performance problems that precipitated any rollout of Project Delta. This had been going on for, yes, preceded Project Delta by over a year or even more. I mean, he had had performance problems from the time that he essentially began to work with Barbara Harrison and her group. That's documented in the record in the form of emails where she would repeatedly reach out to him to let him know that he'd made certain errors in data calculations, and he also continually had to have a problem with meeting deadlines. So I think that you have to look back to the fact that these problems had been going on for a very, very long time. And even in his performance management plan as early as March of 2016, his problems were documented. The indication was that his performance was below the expectations of a PSG 23 employee in areas of independent work and analytical methodology. And again, in his August 2016 performance management report, the notation was that despite a year in role, he continued to rely heavily on CSAT and others to assist and guide data analysis versus demonstrating ownership of the process. So these were the types of comments that were repeatedly reflected and documented in performance reviews and in emails. So I think that it's difficult to kind of look forward and wonder why he wasn't terminated as part of the... It makes sense why he was terminated and not because there were two separate tracks. Why wasn't he terminated earlier? That's still not clear. Well, I think that what they were trying to do was to work with him. They know that there's not going to be a space for him anyway. Why are they trying to work? That's a lot of extra effort if you know the person's not working out and you're not even going to have a space for them. Well, I think they were trying to do whatever they could to make sure that he completed the performance, the PIP, basically. Why do they care if he completes the PIP if there's no job for him at the end of the PIP? Well, I guess, theoretically, what could have happened if he did successfully complete his PIP that he might have been offered another position somewhere within the company. I think that they were doing everything that they could to work with him and try to make him be successful in the position. But unfortunately, he just wasn't able to do the work. His job was a very highly paid position and it required acute analytical skills and analysis of documentation and meeting deadlines. And those are things that he just wasn't able to accomplish. I mean, remind me of the record. After they realized that this two days is the time, did somebody from HR say, whoa, wait a minute, are we sure this is the right date because this messes him up for his benefits and that sort of thing? I don't think that that's really, that's not what the evidence shows. What the record shows is that his PIP period, typically PIP periods last anywhere from two to four months and his PIP was typically, was longer than most. But there is evidence that he wanted to take a vacation. So actually, his PIP period was supposed to end much earlier than the 15th or about a week before, but it was extended because of his vacation. And then later on, Barbara Harrison had some travel issues because she had been transferred to California. So it was moved two days earlier. I don't think that had anything to do, and the record doesn't support the fact that it has anything to do with the rollout of Project Delta. So there's no evidence in the record one way or another whether somebody eventually brought this to management's attention for them to reconsider the dates. That's not in the record? Your Honor, I'm not aware of any evidence other than the fact that . . . Because that would normally happen at most HR. They would say, oh, well, you might want to do this for maximum benefit, especially if you're letting somebody go, so they don't sue you later and that sort of thing. Well, I think the problem was that they had made a decision to terminate him prior to that. And I think it was in January. And so they had already made the employment decision, and it was still prior to the rollout of Project Delta. And so they just . . . because he was going down this different path from . . . Project Delta was kind of occurring in the background, and he was in a different situation because he had long-term employment issues. They had worked with him and done their best to try to make sure he'd be successful. And at some point, they just decided that he wasn't going to be able to cut it. But that doesn't mean that they had to include him in Project Delta. There's no evidence in the record at all that he would have even been entitled to benefits under Project Delta. Did Shaw ever raise that when he was fired? Did he say, wait, wait, can you wait two days for the test or anything? Or did he even know it? Well, I think that he did eventually hear about Project Delta, and that is part of his claims in this case. But our position is that he wasn't eligible to participate because of his termination date. But he wasn't fired the day that Harrison documented that she was going to terminate him. Why was that? I think that it probably had to do with her travel schedule and being able to come and meet in the official meeting with him. And so that's why that happened. And there's two different paths where he has had long-term employment problems. They're trying to work with him, but it's just not working out. And then Project Delta is going on, and he wasn't eligible for benefits at all. He was terminated before the date it became effective. And also the particular employees who would be included within Project Delta weren't even notified about their positions were in scope until I think it was March. So it's just not, there's no nexus between the two. And I think that doesn't raise any sort of genuine issue of material fact. Because even if they considered him, or even if it could be viewed as Project Delta motivated the termination, the law is pretty clear that general cost-cutting measures are insufficient to demonstrate an improper motive. So even if you view it from the lens of, well, you know, I guess it maybe was Project Delta, that still doesn't help Shaw at all. Because the law says, and I think the Fifth Circuit has made it pretty clear, that that is not sufficient evidence to demonstrate discriminatory intent. I'd also like to just briefly address the retirement benefits. Another important thing to note is that improper motive alone, I'm sorry, improper motive results in more than an incidental loss occasioned by the discharge is also insufficient to demonstrate discriminatory intent. So the fact that Mr. Shaw just lost benefits doesn't show that any improper motivation. That incidental losses of benefits are always a typical consequence when anybody gets terminated. And Shaw made the mistake of not putting forth any evidence of any benefit savings that actually helped him prove his case. For example, in the record, he just makes conclusory allegations about benefit savings, and he also refers to his supplemental responses to disclosures. But that's not evidence. His own conclusory allegations about what his lost benefits would be, he would have had to put on some additional evidence to show what the whole pot was, what was in the entire pot. Is there no evidence of the damages? He claims that he lost $78,000 in retirement benefits as well as $28,000 in severance benefits. But it's only in his responses to requests for disclosures, that's the only evidence that he offers. That was objected to. And it was objected to, and it's not competent summary judgment evidence. It's not sworn. I would have to address that if we agree with you on the issue. Is that correct? You're right. I think that he did not meet his burden to prove that benefit savings was any sort of a motivating factor. I'm just trying to figure out what's dependent upon what else. Right. And again, just the mere cost-cutting in general, that's not evidence of discriminatory intent as well. And I'd also like to just briefly address the timing allegations that he relies a lot on temporal proximity between the date of his termination and the vesting of his benefits in the rollout of Project Delta. But this court has recognized that timing alone between termination and vesting of benefits is insufficient to demonstrate discriminatory intent. A prima facie case requires some evidence beyond temporal proximity to demonstrate that pension interference was or may have been a motivating factor. And I think if you look at all the cases, even to establish a prima facie case, you have to have something more than just temporal proximity. And I think that's sort of borne out in a lot of the cases that we've cited, the Dister case in Stafford. In those cases, temporal proximity was found based on the close proximity in time between the termination and vesting of benefits. But there was also something else. In other words, there was evidence offered that of the benefit savings, or there was some substantial medical bills, and so that could have been viewed as a motivating factor. So I think that the cases also support our position that temporal proximity alone is also insufficient, or is insufficient for Shaw to demonstrate even a prima facie showing. And really, even if Shaw had demonstrated a prima facie case, it doesn't matter, because he really doesn't even challenge in his brief that Chevron came back and stated non-discriminatory legitimate reasons for terminating him. So even if he had gained any headway by making a prima facie case, which again, we disagree, and we think the district court got it right, it wouldn't even matter, because he didn't even challenge the second element that we stated a legitimate non-discriminatory reason for terminating him. And again, when the court gets to the issue of pretext, he still has failed to meet his burden because he relies on the same type of evidence that he did for his prima facie case, which is just nothing more than conclusory allegations and speculative assumptions. He had to do something more to raise a fact issue, rather than, again, conclusory assumptions. The type of evidence that he relies on are just merely... Shaw wants the court to make unreasonable inferences, and that's simply not what the evidence shows. For example, Shaw, and I believe he mentioned this before, he refers to Harris's statement and Shaw's PIP that he failed to meet a deadline, but the evidence shows that he actually did fail to meet a deadline. He and his supervisor weren't sure of the actual time, and so the fact that Harrison stated in his performance improvement claim that he didn't meet a deadline is accurate. He also claims that there was an after-the-fact paper trail that was created by Yates, but that is also untrue because the record shows that all Yates said was just that he was documenting some of the discussions that he had had with Barbara Harrison and others. Shaw also claims that his interviews were unsupported because he received some positive feedback, but that, again, doesn't change the fact that Barbara Harrison, his supervisor, didn't really feel like he was doing what he needed to do to perform properly. So, you know, even if Barbara Harrison had been wrong, it was her decision to terminate him based on poor performance, and the courts should not be able or be in the position of second-guessing business decisions. And, again, I think another important point is that regardless of all of this, the undisputed and uncontradicted evidence is that Harrison didn't know when his benefits were going to vest, and Yates also said he didn't know about when the benefits would vest either, and this evidence is not contradicted at all by Shaw. So I think that's another basis for the court just to affirm the judgment because he never even attempted to contradict evidence that these decision-makers didn't even know when his benefits would vest. Thank you, counsel, unless you have something further. Thank you. Just to address a few points regarding the prima facie case. There is evidence in the record as to the amount of damages, but also there's no requirement to put a dollar amount. In the Fifth Circuit case of Stafford v. True Temper Sports, the only evidence was there would be medical expenses, but there was no amount stated, and the Fifth Circuit said they established a prima facie case. In Nero v. Industrial Molding, in the Fifth Circuit case, they affirmed a trial court decision where the amount of damages was $25,000, and so they affirmed a decision on that amount. Again, there's no set formula. It's not like you plug in a number and say this is it. I think you look at a combination of factors. You look at the evidence as a whole, and based on the timing, it is an issue. I do want to get to the performance issues because I think, just to emphasize, Jose Colon is a proper comparator, and there is evidence in the record that his PMP, his review, was a three, which is objectively lower than what Mr. Shaw got by the same manager. Ms. Harrison helped Mr. Colon move on to another job, get another position, even though she thought his performance was bad enough to give him a three. She did not do that with Mr. Shaw here, and so that changes, that puts him in a situation where he's being treated worse than a comparator. With respect to the PIP, all representations to Mr. Shaw was that it would be February 15th as the deadline. And I do want to point out one thing regarding Project Delta. It was created, it did create an ERISA pension, ERISA benefit, sorry, not pension, ERISA benefit, but there's no evidence that anybody actually received it except for one employee out of the entire VCO division, which is in the record, and the thought would be because they're talking about, they've been cited by both parties, many, whether it's a layoff or reduction in force, there are many people getting benefits or they may have already been vested in benefits and there might be incremental increases. Given that Project Delta resulted in possibly one employee with no details as to the amount, I think that also supports the fact that when you compare it to these other cases that his benefits would have been a motivating factor. Barring any other questions, I believe that's all I have. Thank you, counsel. We have your case. It's been submitted to the court. We appreciate your arguments today and the court will stand in recess until 9 o'clock tomorrow. Thank you.